UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALBIAN LEYVA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CAUSE OF ACTION NO. |
| | § | 1:22-cv-00580-LY |
| RYAN HARTMAN, JACINTO | § | |
| MELENDREZ, LUKE BEGWIN, JORDAN | § | |
| PERKINS, and THE CITY OF SAN | § | |
| MARCOS, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff Albian Leyva brings this 42 U.S.C. § 1983 case against Defendants Ryan Hartman, Jacinto Melendrez, Luke Begwin, and Jordan Perkins, former and current SMPD police officers, because they used or failed to stop the brutal excessive force against him, and against Defendant City of San Marcos for its practices that caused such excessive force to be employed.

## I.   PARTIES

1.   Albian Leyva is a resident of San Marcos, Texas.

2.   Ryan Hartman is a resident of San Marcos. Hartman was at all relevant times a police officer with the San Marcos Police Department, and is sued in his individual capacity for compensatory and punitive damages. Hartman has been served and has appeared in this case.

3.   Jacinto Melendrez is a resident of Canyon Lake, Texas. Melendrez was at all relevant times a police officer with the San Marcos Police Department, and is sued in his individual capacity for compensatory and punitive damages. Melendrez has been served and has appeared in this case.

4.      Luke Begwin was at all relevant times a police officer with the San Marcos Police Department, and is sued in his individual capacity for compensatory and punitive damages. Begwin can be served with process at 2300 S Interstate 35, San Marcos, Texas 78666.

5.      Jordan Perkins was at all relevant times a police officer with the San Marcos Police Department, and is sued in his individual capacity for compensatory and punitive damages. Perkins can be served with process at 2300 S Interstate 35, San Marcos, Texas 78666.

6.      The City of San Marcos is a Texas municipal corporation in the Western District of Texas that operates the San Marcos Police Department and employed Hartman, Melendrez, Begwin, and Perkins at all relevant times. The policymaker at all relevant times for the City of San Marcos is Police Chief Stan Standridge. The City of San Marcos has been served and has appeared in this case.

## II.    JURISDICTION

7.      This Court has federal question subject matter jurisdiction over this 42 U.S.C. § 1983 lawsuit under 28 U.S.C. § 1331.

8.      This Court has general personal jurisdiction over Hartman, Melendrez, Begwin, and Perkins because each lives and works in Texas. The City is subject to general personal jurisdiction because it is a Texas municipality.

9.      This Court has specific personal jurisdiction over Hartman, Melendrez, Begwin, Perkins, and the City because this case is about their conduct that occurred in San Marcos, Texas.

## III.    VENUE

10.      Under 28 U.S.C. § 1391(b), venue is proper in the Western District of Texas because all relevant events occurred within Hays County, which is within the Western District of Texas.

## IV.    FACTS

**A. Defendants Hartman and Melendrez intentionally shot Plaintiff while his hands were up.**

11.    On January 12th, 2021, Plaintiff Albian Leyva was a passenger in a car pulled over by San Marcos Police Department on suspicion of petty theft of approximately $80 worth of phone charging cords from a gas station convenience store.

12.    The report of the petty theft did not include weapons.

13.    There was no reason to suspect the individuals in the vehicle were armed or a threat to police.

14.    In fact, none of the individuals in the car had any weapons or were any threat to police.

15.    Plaintiff Leyva was completely innocent and had no knowledge that the driver of the car had stolen phone charging cords.

16.    Still, at least five SMPD officers surrounded the rear of the car with their guns drawn.

17.    The driver of the vehicle was first asked to get out of the car.

18.    He was told to get on the ground with his hands above his head, which he did.

19.    Plaintiff was then told to get out of the car, which he did.

20.    As Plaintiff got out and walked approximately 8 feet away from the car, Defendant Officer Jordan Perkins yelled for Plaintiff to get down on his knees.

21.    At the same time, Defendant Ryan Hartman yelled conflicting orders to Plaintiff to come back toward the officers.

22.    As Officer Perkins first instructed, Plaintiff went to his knees and placed his hands above his head.

23.    Plaintiff took one hand to take his Texas ID out of his wallet. After doing so, he dropped it to the ground for the benefit of the officers.

24.    As he did this, Hartman and Perkins told him to put his hands back up.

25.    Plaintiff put his hands back up.

26.    Hartman then yelled for Plaintiff to stand up and put his hands up.

27.    Plaintiff complied and stood up with his hands up.

28.    Plaintiff then calmly said, "y'all don't need to do this."

29.    Visibly afraid, Plaintiff then pulled his phone out and began to film the officers with his phone.

30.    Neither Hartman nor any other officer gave him any further instructions.

31.    Hartman then told Defendant Officers Melendrez, Perkins, and Begwin to "keep your lights on him" because "I'm going to tase him."

32.    Officers Melendrez, Perkins, and Begwin all heard Hartman say he was going to tase Plaintiff without justification, but none of them questioned Hartman's plan or did anything to stop Hartman from tasing Plaintiff while he posed no threat or danger to anyone.

33.    Officer Melendrez, Perkins, and Begwin all had the opportunity to stop Hartman before he shot Plaintiff with his TASER, but chose not to prevent him from shooting Plaintiff.

34.    In full view of the individual Defendants, Hartman walked toward Plaintiff while pulling out his TASER.

35.    Plaintiff stood peacefully with his hands up.

36.    Prior to being shot by officers, at all relevant times, Plaintiff was unarmed, never threatened anyone's safety in any way, and kept his hands up and completely visible.

37.    Each of the Defendants knew this and saw this.

38.    As Defendant Hartman walked toward his defenseless target, he told Defendant Officer Melendrez to use his TASER on Plaintiff as well.

39.    Instead of questioning that instruction and stopping Hartman from using his TASER, Melendrez joined in the use of force and shot Plaintiff as well.

40.    Despite knowing that Plaintiff did not pose any danger or threat of any kind, both Defendants Hartman and Melendrez shot Plaintiff with their TASERS as he stood peacefully.

41.    As was the well-known and routine custom at the time, none of the other officers at the scene intervened to stop this obviously excessive and dangerous use of force.

42.    Electrocuted by two TASERS, the jolt of electric voltage that ran through Plaintiff's body caused him great pain and his body to stiffen and convulse.

43.    Plaintiff immediately fell backward on the ground.

44.    Once on the ground, Plaintiff complied, as he had with prior commands, with every command to roll over and put his hands behind his back.

45.    Shockingly, Defendants arrested Plaintiff and charged him interference with public duties.

46.    This arrest was made without probable cause.

47.    In fact, Melendrez falsely stated in his probable cause affidavit that Plaintiff did not comply with verbal commands to put his hands up, turn away from officers, and walk backwards.

48.    Hartman also falsely described the events in his police report even though he watched video contradicting his own report before filing it.

49.    Plaintiff did in fact comply with those commands.

50.    Melendrez falsely stated that he deployed his TASER due to Plaintiff's "failure to comply."

51.    Melendrez also purposefully omitted numerous material facts, such as Plaintiff was compliant, did nothing wrong, and had his hands up in a surrender position when he shot him.

52.    All charges against Plaintiff, which were utterly baseless, have been dismissed.

53.    SMPD Police Chief Standridge later concluded that Hartman's use of his TASER was unnecessary, unreasonable, excessive, and violated SMPD policies.

54.    However, SMPD and Chief Standridge never investigated Melendrez's false arrest and detention of Plaintiff or Melendrez's use of excessive force.

55.    And as failing to intervene to stop excessive force and violations of the Constitution was commonplace at the SMPD and the practice of the SMPD at the time of the incident, Chief Standridge and the SMPD never investigated Defendants Perkins, Begwin, or any officer for failing to intervene to stop Melendrez and Hartman's use of force.

**B. Defendant Ryan Hartman was a known danger to innocent civilians, yet the City's policymaker kept him on the streets, which, in turn, caused the excessive force on Plaintiff.**

56.    Sergeant Hartman was known as a dangerous officer who should have been fired and disciplined for his misconduct long before this incident.

57.    In particular, in June 2020, Hartman was, in all likelihood, drinking and driving, and went through a stop sign, killing Jennifer Miller who had the right of way.

58.    First responders documented Hartman's open, nearly finished Dos Equis tallboy and his confession taking responsibility for Miller's death at the scene.

59.    Although he admitted that he "caused the death of somebody," reports state that Hartman refused to do a field sobriety test at the scene

60.    At the direction of then-Interim Police Chief Bob Klett, the San Marcos Police Department did not investigate Hartman, discipline him, or remove him from street duties.

61.     Instead of discipline, the City of San Marcos gave Hartman a paid sabbatical—"administrative leave"—from his work as a police sergeant after he killed Miller.

62.     The San Marcos Police Department did not investigate based upon the pretext of its policy of refusing to investigate any officer's misconduct until any criminal investigation into the officer's conduct has been completed.

63.     The policymaker, Chief Standridge, has since eliminated this policy of refusing to investigate—so there was never any reason to have the policy in the first place other than to protect the worst officers on the San Marcos force and keep them on duty.

64.     Despite Hartman's clear lack of judgment, his apparent danger to and lack of care for innocent civilians' lives, and the fact that any criminal investigation had been long completed, San Marcos leadership returned Hartman to fulltime police work on December 1, 2020 without conducting an internal investigation into his misconduct and without disciplining him for his apparent misconduct.

65.     In fact, Hartman remained a police sergeant, able to infect subordinate officers with his disregard for human life and improper police tactics.

66.     In other words, the City and the Department's decision to retain—without any discipline or retraining whatsoever—enabled Hartman to order or instruct subordinate officers to engage in or assist him in unconstitutional excessive force, just as he did here.

67.     San Marcos Police Chief Standridge was hired in October 2020. Standridge, like Klett, also failed to timely investigate Hartman's misconduct or to discipline him.

68.     When questioned later about his decision to not investigate or discipline Hartman, Chief Standridge gave the phony excuse that more than 180 days, the maximum time allowed under Local Government Code between discovery of an alleged rules violation and discipline. This

was wrong. As Chief Standridge knew, only 144 days had passed between the day of the crash on June 10, 2020 and the end of the criminal investigation on November 1, 2020.

69.     Moreover, upon information and belief, Chief Standridge personally called Pam Watts, Jennifer Miller's life partner that was also in the car that Hartman hit, to tell her that Hartman would be returning to full duty on December 1, 2020.

70.     Ultimately, the City chose to not investigate or discipline its employee, Defendant Hartman, for killing Jennifer Miller.

71.     The obvious result of the policy decision to exempt Defendant Hartman from any consequences for causing the death of another person was that Hartman would remain a police officer and continue to endanger innocent members of the public, like Plaintiff.

72.     Because of this, Chief Standridge was on notice that Sergeant Hartman was a danger to innocent civilians in San Marcos and had shown a willingness to violate the law (driving with an open container, reportedly refusing to take a sobriety test and likely, drinking and driving) but refused to take any steps necessary to investigate or discipline Hartman before he could hurt another innocent civilian.

**C. San Marcos has a pattern and practice of excessive force, failure to intervene, and making false arrests.**

73.     There is a culture of violence and officer impunity amongst the San Marcos Police Department.

74.     Prior to and including January 12, 2021, there have been multiple incidents where an SMPD officer committed excessive force, other officers have failed to intervene, and officers made arrests without probable cause to cover for their misconduct.

75.    For example, on May 29, 2013, San Marcos Police Department Officer James Polermo was in the process of a traffic stop when he yelled at Alexis Alpha for walking between him and the car he had stopped.

76.    After a brief argument, SMPD Officer Palermo grabbed Ms. Alpha by the neck and slammed her to the ground face first, breaking several of her teeth and giving her a concussion.

77.    Still, Officer Palermo arrested and charged Ms. Alpha with a felony of Obstructing an Investigation.

78.    All charges against Ms. Alpha were later dropped and the SMPD agrees that there was no probable cause for her arrest.

79.    Months earlier, on March 15, 2013, Officer Palermo slammed a handcuffed individual to the ground without reason or justification, then tased him several more times once on the ground. Officer David Anerson had already handcuffed the subject before Officer Palermo's arrival, but Officer Anerson did nothing to intervene to prevent Officer Palermo's obvious use of excessive force.

80.    Upon information and belief, Officer David Anerson was not investigated for his failure to intervene to prevent excessive force.

81.    Officer Palermo was indicted by a Hays County Grand Jury on November 6, 2013 for his use of force on Ms. Alpha.

82.    On the evening of May 25, 2019, SMPD Officers John Dehkordi, Andrew Wisener, and Basil Pierce arrested John Kelley, a deaf man, for arguing with his wife in American Sign Language.

83.    At all relevant times, Mr. Kelley was completely unarmed and unthreatening to the SMPD officers.

84.     Despite Mr. Kelley and his wife telling the officers he was deaf, Officers Pierce and Dehkordi shot Mr. Kelley with their TASERs without reason.

85.     Mr. Kelley fell to his knees where he was tased at least three more times in his back, ribs, and near his eye.

86.     When Mr. Kelley tried to roll away from the TASER, Officers Dehkordi, Wisener, and Pierce held him in place while Officer Wisener kicked him in the torso multiple times until Mr. Kelley blacked out.

87.     Officers Dehkordi, Wisener, and Pierce used obviously excessive force.

88.     None of the officers present intervened to stop the other officers from using excessive force.

89.     Upon information and belief, none of the officers involved were investigated or disciplined for their use of excessive force.

90.     Upon information and belief, none of the officers involved were investigated or disciplined for their failure to intervene.

91.     Upon information and belief, there were numerous other examples of excessive force, false arrest, and failing to intervene to stop such unconstitutional conduct committed by SMPD officers prior to January 12, 2021.

92.     Upon information and belief, the City of San Marcos and the past and present San Marcos Chief of Police were aware of the history of the many instances of failing to intervene and prevent unjustified excessive force, with or without the use of a TASER, during arrest or traffic stops/investigative stops, but have not retrained or disciplined officers such that excessive force remains a custom and practice among the San Marcos Police Department.

93.    SMPD officers who have been alleged to have used excessive force or who did not intervene to stop such conduct have not been investigated or disciplined for using excessive force nor retrained in use of force or the proper use of a taser, indicating ratification and acceptance of patterns, practices, customs and/or procedures of the excessive use of force.

94.    Upon information and belief, the City of San Marcos and the past and present San Marcos Chief of Police were aware of the history of the many instances of false arrest/false imprisonment made to cover up excessive force/misconduct but have not investigated, trained, re-trained, or disciplined officers such that false arrest/false imprisonment remains a custom and practice among the San Marcos Police Department.

95.    San Marcos policy directly facilitated this practice of covering up excessive force and failing to intervene, as officers were not required to submit a use of force report until two sleep cycles after the incident occurred—ensuring that officers would have time to coordinate their stories and check to make sure video evidence would not directly rebut their claims, rather than the candid report on recent recollections that the reports should be.

96.    Upon information and belief, many SMPD officers who have made false arrests or have lied in probable cause affidavits have not been investigated, disciplined, trained, or re-trained to ensure that they make accurate, detailed, or corroborated affidavits, indicating ratification and acceptance of patterns, practices, customs and/or procedures false arrest for the purpose of protecting officers from allegations of misconduct.

97.    In addition, despite the obvious need for one in light of the alleged pattern of misconduct and use of excessive force, as well as policymaker notice that departments in the Western District, including the Austin Police Department, had adopted a mandatory policy on de-escalation, San Marcos failed to have a mandatory de-escalation policy for many years prior to

this incident. Even though a citizen review committee recommended that this be fixed over a year earlier and numerous departments had adopted one years ago, San Marcos' written policies and deficient supervision failed to require officers to de-escalate rather than escalate their encounters, causing excessive force just as occurred in this case.

98.    Hartman, a sergeant who directed the actions of his subordinate officers, claimed that he was trained that the use of a TASER under these circumstances, i.e. shooting a compliant, unarmed person with his hands over his head, was appropriate based on San Marcos policy and training.

99.    In fact, Hartman claimed that tasering a compliant subject was allowed as long as it was a convenient means to detain a subject. It is not.

100.    Based on historical reports from 2004 and 2005, San Marcos police officers used TASERs and other electrical weapons against subjects posing no danger warranting their use at alarming levels and a majority of the times the weapons were used. According to these reports, this occurred more than 60 times in the last year in which the results were analyzed. Upon information and belief, the overuse and inappropriate use of tasers continued up until January 12, 2021.

101.    Likewise, according to public documents from that study, most San Marcos uses of impact weapons and intermediate weapons were used against subjects posing no danger warranting their use, such as when suspects are displaying "passive resistance" or less.

102.    Upon information and belief, the unwarranted use of tasers and intermediate weapons remained in practice at the SMPD prior to the assault on Plaintiff.

103.    After employing excessive force on Plaintiff, Hartman and Melendrez falsely arrested Mr. Leyva for the charge of Interfering with Public Duties.

104.    Upon information and belief, this arrest was made per the custom/practice of SMPD to make an arrest following a use of force.

105.    In any event, the arrest of Plaintiff was made without probable cause.

## V.    CAUSES OF ACTION

### A.    FOURTH AND FOURTEENTH AMENDMENT EXCESSIVE AND UNREASONABLE FORCE AS TO DEFENDANTS HARTMAN AND MELENDREZ

106.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

107.    Defendants Hartman and Melendrez, acting under color of law as SMPD police officers, used excessive and unreasonable force when they shot Plaintiff with TASERs when Plaintiff posed no danger to anyone and when no force was required to take Plaintiff into custody.

108.    This use of force was intentional, was wholly excessive to any conceivable need, was objectively unreasonable in light of clearly established law, and directly caused Plaintiff to suffer serious injuries. Therefore, Defendants Hartman and Melendrez violated Plaintiff's clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

109.    As a direct and proximate result of Defendants Hartman and Melendrez's actions, Plaintiff suffered significant injuries.

110.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

### B.    FOURTH AND FOURTEENTH AMENDMENT BYSTANDER LIABILITY FOR EXCESSIVE FORCE AS TO DEFENDANTS HARTMAN, MELENDREZ, BEGWIN, AND PERKINS

111.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

112.    Defendant Officers Hartman, Melendrez, Begwin, and Perkins, while acting under color of law, each observed that excessive force by other officers as described above was about to occur, but did nothing to stop the other officers from using excessive force.

113.    Defendant Officers Melendrez, Begwin, and Perkins each heard Officer Hartman say he intended to shoot his TASER at Plaintiff without any justification. Officers Hartman, Begwin, and Perkins also heard Officer Melendrez confirm that he was going to shoot his TASER.

114.    Defendant Officers Hartman, Melendrez, Begwin, and Perkins knew at the time that tasering Plaintiff was excessive and that there was no justification for tasering Plaintiff. Defendant Officers Hartman, Melendrez, Begwin, and Perkins saw that Plaintiff was compliant, surrendering, and was not threatening to anyone at all.

115.    Defendant Officers Hartman, Melendrez, Begwin, and Perkins knew the planned force was excessive and each also had the opportunity to intervene to stop the other officers from using excessive force, but did not do so.

116.    Rather, Defendant Officers Hartman, Melendrez, Begwin, and Perkins aided other officers in applying force.

117.    Defendant Officers Begwin and Perkins each kept their lights in Plaintiff's eyes, as instructed by Hartman, to help him shoot Plaintiff with his TASER.

118.    Each of these Defendants' failure to intervene—when they were present at the use of force, had the ability to stop the use of force, and failed to take reasonable measures to protect Plaintiff from the other officers—proximately caused Plaintiff to suffer serious injuries.

119.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

## C. FIRST AMENDMENT RETALIATION AS TO DEFENDANTS HARTMAN, MELENDREZ, BEGWIN, AND PERKINS

120.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

121.    The First Amendment's protections for free speech and assembly prohibit agents of the government from subjecting an individual, like Plaintiff, to retaliation for engaging in protected speech rights.

122.    Filming the police, particularly in the situation here, involving threats of and the use of grossly excessive force, is protected speech.

123.    Upon information and belief, and based on the evidence available, Defendants Hartman, Melendrez, Begwin, and Perkins' uses of force, and failures to intervene to stop other officers from using force, were substantially motivated by their opposition to Plaintiff's exercising his First Amendment right to film the police.

124.    As a direct and proximate result of Defendants Hartman, Melendrez, Begwin and Perkins retaliating against Plaintiff for engaging in his protected speech rights, Plaintiff suffered serious injuries.

125.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

**D.    FOURTH AMENDMENT AND FOURTEENTH AMENDMENT FALSE ARREST, WRONGFUL INSTITUTION OF LEGAL PROCESS, AND FABRICATION OF EVIDENCE AGAINST DEFENDANTS HARTMAN AND MELENDREZ**

126.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

127.    Defendant Melendrez, acting under color of law as an SMPD officer, intentionally caused Plaintiff to be arrested for Interference with Public Duties, even though Melendrez knew that he lacked probable cause to make an arrest.

128.    Likewise, Defendant Hartman conspired with Melendrez to effect that false arrest and falsely accuse Plaintiff of misconduct in his police report.

129.    Hartman knew his allegations were false because he was present at the scene and because he reviewed his body worn camera footage that refuted his allegations before writing his false police report.

130.    Arresting a suspect without probable cause is a flagrant violation of the text of the Fourth Amendment, which explicitly states: "The right of the people to be secure in their persons

15

… against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation."

131.    Melendrez submitted an affidavit to detain Plaintiff that contained material falsehoods that, if removed, would have meant the affidavit did not support probable cause to believe Plaintiff had committed any crime.

132.    Melendrez's affidavit was supported by Hartman's fabricated police report.

133.    Because of Melendrez's reckless and knowingly false affidavit and Hartman's fabricated police report, Plaintiff was imprisoned and subject to criminal prosecution.

134.    In the alternative, the length of Plaintiff's imprisonment, the reputational harm from his prosecution, and the cost of Plaintiff's criminal defense was exacerbated as a proximate result of Melendrez's recklessly and knowingly false affidavit and Hartman's fabricated police report.

135.    Thus, Melendrez's and Hartman's conduct was objectively unreasonable, violated Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments of the U.S. Constitution to be free from arrest without probable cause, institution of legal process without a good faith showing of probable cause, and free from prosecution based upon fabricated evidence. Defendants' conduct proximately caused Plaintiff to suffer significant damages. Accordingly, Melendrez and Hartman are liable for damages under 42 U.S.C. § 1983.

**E. FOURTH AND FOURTEENTH AMENDMENT SUPERVISORY LIABILITY AGAINST DEFENDANT HARTMAN**

136.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

137.    Defendant Hartman, as a supervisory officer, violated Plaintiff's Fourth Amendment right to be free from excessive force by ordering or instructing Defendant Melendrez to shoot Plaintiff with his TASER without any justification.

138.    By instructing Defendant Melendrez to shoot Plaintiff with his TASER, as well as by his own use of force, Defendant Hartman affirmatively participated in the act that caused the constitutional violation.

139.    As a direct result, Defendant Melendrez shot Plaintiff and Plaintiff suffered serious injuries.

140.    As noted herein, Defendant Melendrez's use of force was intentional and wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused Plaintiff to suffer serious injuries. Therefore, Defendants Hartman and Melendrez violated Plaintiff's clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

141.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

**F.  PUNITIVE OR EXEMPLARY DAMAGES AGAINST DEFENDANT HARTMAN, MELENDREZ, BEGWIN, AND PERKINS**

142.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

143.    Defendants Hartman, Melendrez, Begwin, and Perkins' conduct was intentional, egregious, reckless, and abhorrent with respect to a known risk of serious harm and personal injury to Plaintiff. Plaintiff seeks punitive damages against only these individual defendants to deter constitutional violations from happening to others in the future and to send a message that such abuses will not be tolerated by our community.

**G.  FOURTH AND FOURTEENTH AMENDMENT § 1983 *MONELL* CLAIM FOR FAILURE TO SUPERVISE HARTMAN AGAINST DEFENDANT CITY OF SAN MARCOS**

144.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

145.    San Marcos Police Department Police Chief Stan Standridge is a final policymaker for the City of San Marcos concerning law enforcement matters, hiring and firing of officers, and all of the conduct of the individual Defendants in this incident.

146.    The City of San Marcos, acting through its policymakers, including Chief Standridge, had a policy, practice, or custom of failing to supervise and discipline its police officers for misconduct.

147.    The City of San Marcos failed to supervise and investigate Defendant Hartman.

148.    The City of San Marcos knew on January 12, 2021, that Defendant Hartman lacked the judgment necessary to be a police officer.

149.    Defendant Hartman had killed a woman while driving with an open container, suggesting he had likely been drinking alcohol, and had reportedly refused a field sobriety test, yet Chief Standridge failed to supervise, investigate or discipline Defendant Hartman.

150.    On January 12, 2021, Hartman violated Plaintiff's right to be free of excessive force.

151.    If Hartman had been investigated, disciplined, and properly supervised, he would not have operated with such a lack of impunity on January 12, 2021.

152.    The City's failure to investigate and supervise Hartman after having evidence he had broken the law and suggesting his drinking and driving and recklessness had killed Miller made it highly predictable that he would abuse his authority again.

153.    During Hartman's reinstatement hearing in May 2022, Hartman brought forward alarming evidence that San Marcos Police Department fails to supervise SMPD officers.

154.    Upon information and belief, many more SMPD officers have not been disciplined for significant misconduct.

155.    Upon information and belief, the City of San Marcos' failure to supervise SMPD officers has allowed multiple police officers to escape scrutiny and commit further abuses of their

authority by committing or failing to stop excessive force against individuals and otherwise injure the public, or by falsely arresting citizens.

156. The policies/practices, customs, and training described above, including but not limited to retaining and not investigating Hartman following the death of Jennifer Miller, were actually known, constructively known, and/or ratified by the City and its policymakers, including, but not limited to, Chief Stan Standridge and were promulgated with deliberate indifference to Plaintiff's rights under the United States Constitution.

157. In fact, the known and obvious consequences of each of the above policies, practices, customs, or training, including but not limited to its retaining of Hartman following the death of Jennifer Miller. was that City of San Marcos police officers would be placed in recurring situations where the constitutional rights of innocent people, like Plaintiff, would be violated. Accordingly, these policies, practices, and customs also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

158. Consequently, each of the above policies, practices, customs, and training delineated above, including but not limited to retaining and not investigating Hartman following the death of Jennifer Miller, were a proximate cause and moving force of Plaintiff's arrest, tasering, and his injuries.

## H. FIRST, FOURTH AND FOURTEENTH AMENDMENT § 1983 *MONELL* CLAIM AGAINST DEFENDANT CITY OF SAN MARCOS

159. Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

160. The City of San Marcos had the following policies, practices, or customs in place when Defendant Officers caused Plaintiff to suffer injuries and violations of the Constitution:

    a. Using force when it is not justified;

    b.   Using excessive force on surrendering or otherwise non-threatening subjects;

    c.   Failing to investigate, supervise or discipline officers for endangering the public or violating the Constitution;

    d.   Falsely or inaccurately documenting arrests or uses of force;

    e.   Not intervening to stop excessive force or constitutional violations;

    f.   Failing to investigate or discipline officers who fail to intervene to stop constitutional violations;

    g.   Using TASERS when it is not justified;

    h.   Failing to adopt a de-escalation policy;

    i.   Inadequate training on de-escalation, and escalating rather than deescalating force against suspects; and

    j.   Failing to train officers to intervene to stop constitutional violations, including use of excessive force.

161.    Each of the policies, practices, or customs delineated above was actually known, constructively known and/or ratified by City of San Marcos and its policymaker for law enforcement purposes, Chief of Police Standridge, and was promulgated with deliberate indifference to Plaintiff's First, Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that San Marcos Police Department officers would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

162.    Consequently, the policies and conduct delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages.

163.    Further, upon information and belief, SMPD supervisors, including Chief Standridge, reviewed Defendant Officers' conduct with regard to Plaintiff, and with the exception

of Hartman's use of force, found no problems, and took no action to discipline them. As Standridge appears to have reviewed and approved the conduct of Melendrez, Begwin, and Perkins and the basis for it, Standridge and the City of San Marcos ratified the Defendant Officers' actions.

164.    Chief Standridge evaluated the use of force against Plaintiff. While he determined that Hartman used excessive force, he inexplicably countenanced and did not discipline for plainly excessive force by Melendrez and each of the officers' failure to intervene to stop the misconduct. By failing to discipline and essentially approving the lack of intervention, Chief Standridge tolerated, approved, and ratified the above misconduct. As this was his routine practice while running the department, and the officers involved believed their actions would be approved rather than subject them to disciplinary sanction, Chief Standridge acted with deliberate indifference to the rights of citizens, including Plaintiff, and proximately caused the violations described to occur and harm Plaintiff.

165.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

## VI.    DAMAGES

166.    Plaintiff seeks the following damages:

a.    Past and future medical expenses;

b.    Past and future economic damages, including (but not limited to) loss of wages and loss of earning capacity;

c.    Past and future physical pain and mental anguish;

d.    Past and future impairment;

e.    Past and future disfigurement;

f.    Past and future damages for injury to Plaintiff's character and reputation;

g.    Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

    h.   Punitive damages in the highest amount allowed by law against Defendants Hartman, Melendrez, Begwin, and Perkins only.

## VII.    JURY DEMAND

167.    Pursuant to Federal Rule of Civil Procedure 48, Plaintiff hereby requests a jury trial.

## VIII.    PRAYER FOR RELIEF

168.    To right this injustice, Plaintiff requests the Court:

    a.   Award compensatory damages against the City of San Marcos, and compensatory and punitive damages against the individual defendants;

    b.   Award Plaintiff costs and fees, including but not limited to expert fees and attorneys' fees, pursuant to 42 U.S.C. § 1988;

    c.   Award pre-judgment and post-judgment interest at the highest rate allowable under the law; and,

    d.   Award and grant such other just relief as the Court deems proper.

Respectfully Submitted,

**WEBBER LAW**
4228 Threadgill Street
Austin, TX 78723
Phone: (512) 537-8833

By:  ___/s/ *Rebecca Webber*_____
      REBECCA WEBBER
      State Bar No. 24060805
      rebecca@rebweblaw.com

**EDWARDS LAW**
603 W. 17th St.
Austin, TX 78701
Tel.  512-623-7727
Fax.  512-623-7729

By___/s/ *Jeff Edwards*_____
      JEFF EDWARDS
      State Bar No. 24014406
      jeff@edwards-law.com
      DAVID JAMES
      State Bar No. 24092572
      david@edwards-law.com
      PAUL SAMUEL
      State Bar. No. 24124463
      paul@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record via the Court's electronic case filing system on January 13, 2023.

_____/s/ *Jeff Edwards*_____
Jeff Edwards